Exhibit 19

Letter from N. Marzulla to S. Terrell

June 16, 2015



June 16, 2015

Stephen R. Terrell, Esq.
Trial Attorney
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, DC 20044-0663

> Re: Government's refusal to designate witnesses responsive to Plaintiffs' Second 30(b)(6) Deposition Notice

Dear Stephen:

On March 16, 2015, the Tribe served its Notice of 30(b)(6) Deposition identifying fifteen topics. In response the Government designated Paul Yates to testify about topics 1, 2, 3, 6, 7, 8, 10, and 13:

1.      The identification, location, and sale or leasing of third-party easements and rights of way (including but not limited to utilities, pipelines, roads and highways, and railroads) across Plaintiffs' or Claimants' land and the federal government's collection of payments for these easements and rights of way and deposit of these payments into tribal trust accounts or individual Indian money accounts.

2.      All facts relating to the Quapaw Analysis's conclusion that Plaintiffs/Claimants who owned the "allotments that are involved in the ownership of town lots throughout the reservation were never compensated for the easements granted to form streets and alleys, sewer facilities, and electric, phone and gas lines," or the Government's disagreement, if any, to that conclusion.

3.      All facts relating to trespass on Plaintiffs'/Claimants' land, including trespassing related to occupation and use of land without a valid lease or easement, or occupation and use that is not compliant with the terms of the lease or easement.

6.      All facts relating to the Quapaw Analysis's conclusion that

"damages ... have resulted from non-use and loss of value due to lack of proper trust management and supervision of the Catholic Mission Land" and "that the royalty realized by the Catholic Church from removal of lead, zinc, and chat from 1937 to 1975 is a valid damage due and owing to the Tribe."

7. The factual bases for the Government's denial of the allegations contained in paragraph 77 of the Claimants' Complaint:

> The Government's actions and policies regarding mining, waste disposal, town construction, and rights-of-way (among others) have destroyed the Quapaws' use of their homelands for traditional activities such as agriculture, hunting and fishing—all in violation of the Government's fiduciary duty of trust to preserve and protect Quapaw trust and restricted lands under the Government's control and supervision.

8. The Government's role in the sale, leasing, permitting, production, or removal of chat on Plaintiffs/Claimants' lands; and its practices and procedures for ensuring that Plaintiffs/Claimants have been paid fair market value for all sales or leases of chat.

10. Mining royalties from mining activities on the Catholic 40 property, as described in the Quapaw Analysis.

13. For periods relevant to this litigation, the Government's policies, procedures, and practice for retention, maintenance, and storage of documents and records relating to the Quapaw Tribe and its members; any destruction or loss of documents and records, such as the Bureau of Indian Affairs' destruction of environmental documents and records relating to the Tar Creek Superfund Site, as reported in an undated report of the Office of Internal Evaluation and Assessment; the reasons for any document destruction; the description of the documents destroyed; and any subsequent investigations or reports concerning any document destruction.[1]

On April 28, 2015, the Tribe took Yates's deposition on those topics. At the completion of that deposition, counsel for the Tribe, Roger Marzulla, stated that the deposition failed to comply with Rule 30(b)(6) requirements:

Mr. Marzulla: Counsel, I do want to state on the record that we've received

---

[1] Notice of 30(b)(6) Deposition of the United States (Mar. 16, 2015).

an awful lot of I don't know answers to questions in each of the categories for which this witness was offered as a spokesman for the United States. We do not consider that to be adequate under rules of the Court of Federal Claims 30(b)(6). We have not received answers to critical evidentiary questions here. And so we reserve the right to request additional witnesses or other relief from the Court.[2]

As you know, under RCFC 30(b)(6), a designated witness "must testify about information known or reasonably available to the organization." Yet during Yates's deposition, he repeatedly stated that he knew little or nothing about the topics for which the Government had designated him.

Following sets forth some of the testimony that we believe is inadequate:

**Topic 1—Easements and rights-of-way on Quapaw land**

> Q: Are you familiar with the rights-of-way on which the county roads were constructed?
>
> A: No.
>
> Q: Are you familiar with the rights-of-way on which the state highways were constructed?
>
> A: No.
>
> Q: Are you familiar with the right-of-way on which the federal highway, the Will Rogers Turnpike was constructed across the Quapaw Reservation?
>
> A: No.[3]
>
> \*\*\*
>
> Q: And what kinds of utilities cross the Quapaw Reservation?
>
> A: Telephone and electric utility that I've observed. I'm not familiar with which specific ones or who owns them.
>
> Q: Okay. Are the telephone utilities above ground?
>
> A: I don't know. I don't have any knowledge.[4]
>
> \*\*\*
>
> Q: Are there any pipelines that cross the Quapaw Reservation?
>
> A: Not that I can recall.
>
> Q: What about natural gas pipelines, are there any of those that pass the Quapaw Reservation?
>
> A: I'm not familiar with any.

---

[2] Yates Dep. 113:19–114:4.
[3] Yates Dep. 13:6–10.
[4] Yates Dep. 13:15–22.

Q:    Well, are you able to testify today under oath that the BIA does have records of each and every right-of-way and easement that crosses the Quapaw Reservation?

A:    No. I'm not ready to testify to that. I've not done the research.[5]

             ***

Q:    In preparing for this deposition, did you determine whether there are, whether there are records in the TAAMS system of the rights-of-way—let's start with—go back through what we discussed before, first of all, with respect to railroads on the Quapaw Reservation?

A:    No, I did not do an inventory of the rights-of-way or easements on the Quapaw jurisdiction.

Q:    Did you look to see or review to determine whether there are within the BIA records of the rights-of-way for the railroads that cross the Quapaw Reservation?

A:    No.

Q:    Same question with respect to utility lines that cross the reservation. Did you look those up?

A:    No.

Q:    Did you ascertain whether the BIA has records of rights-of-way for pipelines that cross the Quapaw Reservation?

A:    No.[6]

             ***

Q:    So is it fair to say you don't know one way or another whether the BIA has records of all of the easements and rights-of-way that cross the Quapaw Reservation?

A:    That's correct.[7]

## Topic 2—Payments for easements and rights-of-way

Q:    As we sit here today, do you have any information at all on topic two? That is, the question of whether any compensation was paid to the tribe or any of the members of the Quapaw Tribe for any easement or right-of-way in connection with any of the towns that were constructed on the Quapaw Reservation?

A:    No.[8]

---

[5] Yates Dep. 16:18–23.
[6] Yates Dep. 15:3–25.
[7] Yates Dep. 16:24–17:3.
[8] Yates Dep. 56:1–56:8.

## Topic 3—Trespass

Q:    Would you turn to pages 53 and 54 of the Quapaw Analysis, and there's a reference to Richard Barrett who appears to have trespassed on the Anna Beaver allotment and also on the Slim Jim and Sin Tah Hah Hah Track. Do you know whether any damages were ever collected for that trespass?

A:    I do not know.

Q:    Okay. On page 95 of the Quapaw Analysis, the Quapaw Analysis says that with respect to Picher that trespass was rampant and the agency never established a workable method of controlling the rent—the collection of rental for the trust owners. Is that statement correct?

MR. TERRELL: Objection. Outside the scope of the designation.

A:    I do not know.

Q:    Okay. Do you know whether anyone would know whether that statement is correct?

A:    No.

Q:    On page 100 of the Quapaw Analysis it states that inspection reports of trespass, theft, encroachment and production verification were never acted upon by the BIA, this with respect to mining properties. Is that true?

MR. TERRELL: Objection. Outside the scope of designation.

A:    I do not know.[9]

## Topic 6—Catholic 40

Q:    I'm going to move on now to topic six, the so-called Catholic 40 lands. The Quapaw Analysis estimates mining royalties that would have gone to the tribe had title to that land not been deeded to the Catholic Church to between $269,961 to—somewhere between that and $711,564. Do you agree that that is the amount of mining royalties that the tribe would have received had the land not been transferred to the Catholic Church?

MR. TERRELL: Objection. Outside the scope of the designation.

A:    I don't know.[10]

*** 

Q:    Right. What I'm asking you is not about the legal question, but about the value of the royalties. To your knowledge, has the United

---

[9] Yates Dep. 63:2–65:10.
[10] Yates Dep. 68:13–25.

                States made any calculation what the royalties would have been if the—well, apart from whether the land was properly transferred or not?

A:      I'm not familiar with any calculation of that type.[11]

                               \*\*\*

Q:      The Quapaw Analysis states that as a result of mining activities that occurred on the Catholic 40, that the property today is an unusable wasteland. Do you agree with that characterization?

A:      I don't know if that's true or not.

Q:      You don't know whether it's an unusable wasteland or not?

A:      No.[12]

## Topic 7—Environmental degradation

Q:      [T]he Quapaw Analysis states that today hunting and fishing are suppressed as a result of the contamination of the Quapaw Analysis Reservation. Is that statement true?

A:      I don't know.

Q:      You don't know whether hunting and fishing are suppressed as a result of the contamination of the Tar Creek superfund site? That's your testimony?

A:      I'm not sure I understand the question.

Q:      Is it, to your knowledge, safe to eat fish caught in the Tar Creek superfund site streams?

MR. TERRELL: Objection. Foundation.

A:      I don't have any documents in front of me to indicate that it isn't safe. Personally, I wouldn't.[13]

                               \*\*\*

Q:      Wildlife habitats have been significantly destroyed or degraded says the Quapaw Analysis as a result of mining. Do you agree?

MR. TERRELL: Objection. Foundation. Outside the scope of designation.

Q:      Go ahead.

A:      I really don't know.

Q:      Okay. You don't know whether wildlife habitats are degraded by covering them with mining waste? Is that your testimony?

A:      I think I would have to have more facts to draw a conclusion.[14]

---

[11] Yates Dep. 69:12–19.
[12] Yates Dep. 72:3–11.
[13] Yates Dep. 77:8–78:9.
[14] Yates Dep. 83:25–84:11.

***

Q:     Okay. What—what do you understand is the current status of remediation on the Catholic 40 property?

A:     I don't have a lot of information, but my realty assistant has been on the site. And he said that cleanup or remediation efforts were significant, but I've not been out there myself to review.

Q:     And what is the name of your realty assistant?

A:     Kyle Roblyer.[15]

## Topic 8—Chat removal

Q:     Okay. The Quapaw Analysis says that the verification of minimum royalty payments was absent from the lease files that the Miami Agency provided the Quapaw Analysis team. Do you have an explanation for that?

A:     I'm not familiar with what was provided. It was prior to my tenure. I'm not—I'm not just—I'm not familiar with the documents.[16]

***

Q:     Okay. Prior to 2010 was the Miami Agency not responsible for chat sales?

A:     There was a period of time when the chat sales were handled out of the regional office by the Environmental Department.

Q:     And do you know what that period of time was?

A:     No, I don't.[17]

***

Q:     Have you reviewed the Quapaw Analysis'—the Quapaw Analysis' analysis of the removal of chat from the Pioneer chat pile from the years 1952 to 1982 to do a determination of what the royalties should have been? Have you reviewed that part of the Quapaw Analysis?

A:     No, I have not.

Q:     Have you reviewed any part of the Quapaw Analysis relating to the theft or underpayment of royalties due on chat?

A:     No.[18]

***

Q:     Who would be the person most knowledgeable about the determination of fractional interests in chat piles?

---

[15] Yates Dep. 72:3–73:3.
[16] Yates Dep. 90:13–20.
[17] Yates Dep. 92:12–19.
[18] Yates Dep. 103:4–14.

A:     Currently on staff or—

Q:     Yes.

A:     I would say Sam Beets.[19]

## Topic 10—Mining royalties—Catholic 40

Q:     So what investigation did you do with respect to mining royalties on the so-called—you know what I mean when I say Catholic 40—

A:     Right.

Q:     —on the mining royalties of the land that was transferred to the Catholic Church in 1940. What investigation had you done with question?

A:     I reviewed the information contained in the Quapaw Analysis.

Q:     Okay. And did you draw any conclusions, having reviewed that information, as to whether it is correct or not?

A:     My conclusion is that there would have to be a determination of whether the tribe owned those minerals during that time frame.

Q:     Okay. But if we set aside that question—

A:     Uh-huh.

Q:     [D]id you do any investigation—do you have any opinion, first of all, as to whether—there's no question that mining did occur on the Catholic 40 during the time the Catholic Church owned the property; right?

A:     Correct.

Q:     And there's no question that there was income, royalty income, paid to the Catholic Church during the time it owned the Catholic 40 property; right?

MR. TERRELL: Objection. Foundation. Outside the scope of designation.

Q:     Go ahead.

A:     Yes.

Q:     Okay. And there's no question that mining waste was left on the Catholic 40 property as a result of the mining activities—

A:     Yes.

Q:     —is that correct? Okay. But is it correct to say that you are not aware of any calculation that has been done of the amount of royalties that the Catholic Church received?

A:     That's correct.

---

[19] Yates Dep. 93:19–94:11.

Q:    During the—okay.  Fair enough.  Are you aware of any other facts or investigations that have been done with respect to the Catholic 40 property during the time it was owned by the Catholic Church?

A:    No.

Q:    Did the BIA enter into a chat lease on the Catholic 40 property in 1977 after it was restored to tribal ownership?

      MR. TERRELL:  Objection.  Outside the scope of designation.

A:    I've not seen any documents relating to that.

Q:    Have you looked for any such documents?

A:    No.[20]

***

Q:    The Quapaw Analysis says that the verification of minimum royalty payments was absent from the lease files that the Miami Agency provided the Quapaw Analysis team.  Do you have an explanation for that?

A:    I'm not familiar with what was provided.  It was prior to my tenure.  I'm not—I'm not familiar with the documents.[21]

## Topic 13—Document destruction

Q:    In 2008 were certain documents regarding the Tar Creek superfund site destroyed at your office?

A:    No.  At my office?

Q:    Yes.

A:    No.  No, we've never destroyed any Quapaw documents or Tar Creek documents.

Q:    Are you aware of any BIA office in Oklahoma that has destroyed Tar Creek documents?

MR. TERRELL:  Objection.  Foundation.

A:    I don't have anything factual—any facts concerning that.

Q:    But you've heard of it?

A:    I've heard of it, but I have no facts.

Q:    And what is it that you've heard?

A:    Excuse me?

Q:    What is it you've heard?

MR. TERRELL:  Objection.  Hearsay.  You can answer.

A:    I've heard that there was an audit done by the Office of Internal Audit and Affairs, but I've not seen an unredacted copy of that report; so I really cannot testify on that.[22]

---

[20] Yates Dep. 69:20–72:2.
[21] Yates Dep. 90:13–20.

Obviously, the Government did not adequately prepare Yates for his 30(b)(6) deposition, and we do not consider the Government to have met its obligation under RCFC 30(b)(6) with regard to topics 1, 2, 3, 6, 7, 8, 10, and 13. Therefore, the Tribe reiterates its request for one or more designated 30(b)(6) deponents responsive to the Tribe's March 16, 2015 Notice, noting that Yates himself identified several individuals who likely have information known or reasonably available that Yates does not possess.

Finally, on April 7, 2015, we agreed to remove Topic 9 from the Tribe's March 16, 2015 Notice and you agreed to respond to a supplemental interrogatory. Specifically, you stated that "[s]ubject to our relevancy objection, we will answer the interrogatory."[23] On April 13, 2015, the Tribe served its Supplemental Interrogatory on the Government:

> Please describe in detail all activities, and provide a detailed statement of all costs, the United States has incurred, relating or concerning the identification, evaluation, quantification, treatment, storage, transportation, cleanup or remediation of any contamination, pollution, or hazardous substance or waste on Quapaw tribal or members' lands. Please also provide a detailed description of all such remediation activities the United States plans for the future, and an estimate of cost of such activities.[24]

On May 13, 2015, the Government responded with two paragraphs of information, providing only the total costs for work on the Tar Creek Superfund Operable Units 1 to 5. This response did not provide a detailed statement or detailed description about the activities as requested. Under Rules 26 and 33, the Tribe is entitled to interrogatory responses "regarding any nonprivileged matter that is relevant to [its] claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." RCFC 26(b)(1); RCFC 33(a)(2). "[A] general reference to a pile of documents will not suffice." *AAB Joint Venture v. United States*, 75 Fed. Cl. 448, 452 (2007). As trustee, the United States cannot avoid its obligation to provide requested information simply by pointing out that the information could also be obtained by the Tribe. *See Osage Tribe of Indians of Okla. v. United States*, 87 Fed. Cl. 338, 340 (2009) ("[P]laintiff is a trust beneficiary of a trust as to which the United States is the trustee. . . . It is irrelevant that some of these documents may be public documents.").

Therefore, I must reiterate our request for the Government to designate a witness responsive to Topic 9 of the Tribe's March 16, 2015 Notice or provide an adequate answer to the supplemental interrogatory.

---

[22] Yates Dep. 108:6–109:3.
[23] Letter from S. Terrell to N. Marzulla at 3 (Apr. 9, 2015).
[24] Pls./Claimants' Suppl. Interrogatory at 2 (Apr. 13, 2015).

As always, please call me if you wish to discuss anything addressed in this letter.

Yours truly,

Nancie G. Marzulla